Filed 7/7/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S106489 |
| v. | ) | |
| | ) | |
| FRED LEWIS WEATHERTON, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. INF030802 |
| _____ | ) | |

A jury convicted defendant Fred Lewis Weatherton of robbery, attempted murder, and two counts of first degree murder with special circumstances, then returned a verdict of death.[1]  Because juror misconduct during the guilt phase raises a substantial likelihood of actual bias, we reverse the judgment.

## I.  FACTS

In light of our conclusion, we summarize the relevant facts.

On the afternoon of Halloween 1998, defendant, Ernest Hunt, Nelva Bell, her roommate Connie Olivolo, Samuel Ortiz, Latonya Roberson, and her one-

---

[1]    Penal Code sections 211 (robbery), 187/664 (attempted murder), 187, subdivision (a) (first degree murder), and 190.2, subdivision (a)(3) (multiple murder) and (17) (robbery murder).  (Further unlabeled statutory references are to the Penal Code.)  The jury further found that defendant personally discharged a firearm during the crimes (former § 12022.53, subd. (d); § 1192.7, subd. (c)(8)), and that he had suffered seven prior "Three Strikes" convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

1

year-old son convened at Hunt's home in Indio. The adults shared crack cocaine brought by Bell and Olivolo. Defendant was known by the nickname "Boo-Boo."

Defendant had no money, but was intent on obtaining more drugs. During the evening, he suggested Olivolo have paid sex with one of his friends. He and Bell twice acquired crack on credit from a drug dealer. Later that evening, Bell, Roberson, and her son left Hunt's and went to Ortiz's house to spend the night. Defendant returned to the drug dealer's home, where he obtained more crack on credit and displayed what appeared to be a firearm.

Early in the morning of November 1, Bell awoke to hear defendant's voice outside Ortiz's house. Defendant said, "Tonya, Tonya, I just found Ernest [Hunt] dead." Ortiz opened the door, then tried to close it at Bell's urging. Defendant, carrying a long black gun, kicked the door open, entered, and asked, "Where the money at?" Roberson swore she had none. Defendant replied, "Bitch, I ain't playing with you," and shot her in the forehead. Ortiz said, "Boo-Boo, you can have my money," saying his wallet was under the bed. Defendant retrieved the cash then shot Ortiz in the head. Roberson was moaning; defendant shot her in the throat. Bell, holding the boy, pleaded, "Boo-Boo, don't shoot me. I won't tell nobody." At defendant's direction, she put the child down, whereupon defendant shot her in the back. He then stood over her and shot her in the face. Bell had been covering her face with her hand. The bullet passed through her wrist and into her mouth. She "played dead." Defendant kicked her leg several times and left.

Vernon Neal, who lived close by, arrived at Ortiz's house early that morning. He saw Roberson sitting on the floor, the child sitting on a bed, and Ortiz lying face down on the floor. Bell told Neal that Boo-Boo shot them. She told a responding police officer the same thing, adding that defendant acted alone, used a "big gun," and committed the crimes "to rob us." The police located and arrested defendant at Hunt's house.

2

A police officer, who was an experienced tracker, found shoe prints at the scene similar in size, wear, and sole design to the shoes defendant was wearing when arrested. Prints led from Hunt's house to an area near Ortiz's home. Others led north away from the Ortiz residence. The prints leading toward Ortiz's house were close together, suggesting defendant was walking. The prints leading away from the house were further apart, with deeper toe impressions, suggesting defendant was running.

Ortiz died at the scene; Roberson was pronounced dead at the hospital. Bell was alert and talking at the hospital. She had been shot in the back. A second bullet shattered her wrist, entered her mouth, split her tongue, and struck her teeth. Bullet fragments recovered from Roberson's hospital gurney and fragments found in the Ortiz house were determined to have been fired from the same gun.

Bell was initially intubated and unable to talk. She did, however, select defendant as her shooter from a photographic lineup. Asked if she was "100 percent positive," she nodded yes. Bell later told Olivolo that Boo-Boo shot her. Bell, who had known defendant for more than a year, testified she remained "100 percent sure" defendant had shot her and the others.

The jury convicted defendant and returned a verdict of death.

## II. DISCUSSION

Defendant contends Juror No. 1's misconduct during the guilt phase requires reversal of his conviction and sentence.

The jury returned a guilty verdict on February 20, 2002, and the verdict was recorded. Three days later, the trial court received an anonymous phone message that it played for the prosecutor and the defense. The caller said he overheard a young man wearing a juror's badge say, "this guy should be getting the death penalty, because that's what he wants." The caller did not indicate when the incident occurred. The court noted there were only three men on the jury: Juror

3

No. 1 (P.P.), Juror No. 5 (M.K.), and Alternate Juror No. 5 (G.S.).[2]  Everyone agreed the court should question the three jurors.

On February 25, the trial court granted defendant's request to represent himself, appointing defense counsel as standby counsel.

At a February 27 hearing, the prosecutor reported that Juror No. 3 (D.A.) approached an attorney, not otherwise involved in the case.  When D.A. said she wanted to discuss the matter, the attorney refused and reported the incident.  The court questioned D.A., who expressed "concern[] that [defendant] is not getting a fair trial with the jurors."  When D.A. began to discuss deliberations, she was interrupted and excused from the courtroom.  The parties discussed how best to proceed.  D.A. returned and testified that other jurors had engaged in misconduct.  Specifically, she alleged P.P. and M.K. discussed the penalty toward the end of guilt phase deliberations.  P.P. said defendant "should get the death penalty," and M.K. agreed.  The court questioned the other jurors on the panel, including P.P. and M.K.  All denied discussing or making up their minds about punishment.

The trial court also questioned the alternate jurors.  Alternate Juror No. 1 (K.G.) testified that, on several occasions, she heard jurors discuss punishment, saying defendant should receive the death penalty.  K.G. identified P.P. as the person most involved in these discussions.  She also testified that P.P. called her at home during deliberations, saying "he had interesting news."  K.G. said P.P. also called former Alternate Juror No. 6 (T.M.) (who replaced Juror No. 8 (M.R.)) and another alternate juror, described as having red hair.  Alternate Juror No. 4 (L.B.)

---

**2**      In reciting the relevant facts, the designation of jurors becomes somewhat complicated, particularly because some numbered alternates later replaced numbered jurors.  For convenience of the reader, we refer to most jurors using their initials.

testified that, before deliberations, P.P. repeatedly expressed his opinion that defendant was guilty. The other alternate jurors testified they did not recall anyone discussing punishment. P.P. and T.M. were reexamined; both denied discussing the case outside deliberations.

At a February 28 hearing, the trial court discussed the allegations with the parties. The parties agreed that P.P., K.G., and L.B. should be excused. The prosecutor argued D.A. should be excused as well for talking to the attorney, but defendant contended she could be rehabilitated and, in any event, the court should inquire further regarding her allegation that defendant had been denied a fair trial. The court indicated its decision to excuse D.A., K.G., L.B., and P.P. It did not immediately inform the jurors of that decision and said it would ask the four jurors additional questions. The prosecution expressed concern that the jurors' answers might expose them to potential civil or criminal liability and wondered whether the court should advise the jurors of their rights and provide attorneys.

The trial court reexamined L.B. who recounted numerous conversations with P.P. before deliberations began. P.P. told her he believed defendant was guilty and because of Bell's testimony, "there should be nothing else." P.P. also said that, "when he got into the deliberation room he was going to vote guilty . . . he wanted to see where everything was going. But his first vote was going to be guilty." P.P. anticipated "a lot of argument against him in [deliberations]." In particular, he "felt he would have a battle and especially a battle with [D.A.], that they would probably argue." The court asked L.B. whether she thought P.P. "was going to listen to what other people had to say." L.B. said, "No. His mind was made up. That's what I thought." L.B. also testified that P.P. called her during deliberations and reported arguing with D.A.

The trial court reexamined P.P., telling him at the outset, "it is pretty clear to me that you were basically talking to everybody about the case during the whole

5

time prior to deliberations . . . . So that's no longer a question in my mind anymore." P.P. denied prejudging the case, denied saying he thought defendant was guilty, and denied saying before deliberations that he would vote for guilt. To the contrary, he testified he kept an open mind and fully participated in deliberations. Finally, the court reexamined D.A. She testified she overheard P.P. tell M.R. days after the trial began that "he felt that [defendant] was guilty."

At the conclusion of the hearing, defendant moved for a mistrial based on jury misconduct. The trial court explained it could not declare a mistrial because it had already recorded the guilty verdict. The court told defendant he could file a motion for a new trial, but the prosecutor would be given time to respond. In the interim, the penalty phase would begin. The jury was summoned, and the court excused P.P., D.A., K.G., and L.B. Alternate Juror No. 2 (A.G.) replaced P.P., and G.S. replaced D.A. After admonition not to discuss the case with anyone, the panel was excused.

On March 4, the next court day, defendant filed a written motion for a new trial and mistrial, attaching the declarations of D.A., M.R., K.G., and L.B. The motion alleged P.P. prejudged the case and discussed the case with other jurors outside of deliberations. Regarding what effect the allegations would have on the penalty phase, the trial court asked the prosecutor, "if we assume then that there is a presumption of prejudice here, how are you going to rebut or overcome that prejudice?" The prosecutor asked, "as to what issue?" The court responded, "The fact that a juror has pre-decided a case and participated in deliberation and affected the other jurors that are still sitting." When the prosecutor said that there was no evidence that happened, the court said, "Sure we do. [P.P.] prejudged the case, period." The court later remarked, "[P.P.] prejudged. He committed misconduct, and then he carried it into the jury room." When the prosecutor argued there was no evidence P.P.'s misconduct tainted the other jurors, the court

6

noted "defendant is entitled to 12, unbiased jurors." The court also said, "the reason we know [P.P.] was prejudging the case is because he talked to other jurors and was trying to lobby them to vote guilty before the deliberations even started." After a recess, the court softened its view. It said that, at this point, whether P.P. prejudged defendant's guilt was based on the testimony of other jurors who had themselves admitted misconduct.[3] At the prosecution's request, the court ultimately took the motion under submission until after the penalty phase to permit the prosecution to interview the jurors.[4]

With the issue still in flux, the penalty phase began on March 4; a death verdict was returned on March 7. On March 15, a hearing on defendant's motion for a new trial began. At the outset, the trial court and the parties addressed the authenticity and admissibility of declarations submitted.[5]

---

[3] At the conclusion of the March 4 hearing, defendant said, "[it] seem[s] to me the Court already had made a factual finding regarding [P.P.]. . . . This morning I thought I heard you say that . . . [P.P.] had prejudged." The trial court said, "Well, sometimes I play the devil's advocate to help you out . . . ."

[4] When asked for his views on how to proceed, defendant cited California Criminal Law: Procedure and Practice (Cont.Ed.Bar 6th ed. 2002) section 55.33, page 1634: "[A] motion for new trial between the guilt and penalty phases may forestall or render unnecessary the penalty phase. The court and prosecutor may prefer to litigate a motion for new trial before resources have been spent on a penalty phase. If reversible error has already been committed, a penalty phase would be futile." Given significant evidence of serious misconduct, it would be more prudent to rule on a motion *before* proceeding to the penalty phase.

[5] Evidence Code section 1150, subdivision (a), provides, "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Where to draw the admissibility line may prove difficult.

*(Footnote continued on next page.)*

7

A hearing was held on March 20.  At the trial court's direction, conflict attorneys were in attendance.  K.G. was called to the stand.  The court first advised her that some of her testimony might subject her to criminal prosecution or contempt of court.  It advised K.G. of her right against self-incrimination and told her that attorneys were present to assist her if she chose to invoke the Fifth Amendment.  Defendant asked K.G. if she "ever ha[d] an occasion to discuss this case with anybody?"  The court interjected, "Ma'am, that's one of the questions that . . . may incriminate you if your answer would show that you violated your oath as a juror" and asked whether she wanted to speak with an attorney.  When K.G. began to cry, the court excused her from the courtroom and appointed one of the conflict attorneys to "tell [her] what [her] options are."  The appointed attorney first noted that a grant of immunity by the prosecution or the court might be an appropriate solution.  The prosecution indicated it would not offer immunity to any juror, but allowed that the court might decide to grant use immunity.  When recalled to the stand, K.G. asserted her Fifth Amendment rights, and the court granted her use immunity.[6]

*(Footnote continued from previous page.)*

Admissibility of evidence under this statute was litigated in the trial court, and neither party raises the issue here.  We express no opinion on the court's rulings or on the admissibility of evidence relied upon by the court.

[6]    The trial court similarly advised M.R., D.A., L.B., and P.P.  After L.B. and P.P. invoked their Fifth Amendment rights, the court granted them use immunity.  The court also told the remaining jurors that some jurors had admitted committing misconduct and attorneys had been appointed to advise them of their rights.  The court informed the remaining jurors of their rights and told them lawyers could assist them as well, although it noted "this may not involve you."  We have been unable to find another instance in which a court investigating possible jury misconduct similarly advised jurors of their Fifth Amendment rights and offered to appoint an attorney.  Given the speculative nature of the nascent Fifth

*(Footnote continued on next page.)*

K.G. testified that jurors discussed the case from the beginning of trial.  On the first day, P.P. told K.G., D.A., and T.M. that he would vote guilty because "there was no denying Nelva Bell's testimony."  Two to five other times, P.P. told K.G. that defendant was guilty.  K.G. testified that other jurors also said defendant was guilty before deliberations had begun.  After K.G., P.P., D.A., and L.B. had been excused from the jury, P.P. told them he had lied to the court about not discussing the case with others because "he was covering for everybody else, as he would assume that everyone else was covering for him."  On cross-examination, K.G. admitted engaging in misconduct, having a "pretty poor memory," and "having trouble recalling all these facts."

D.A. testified that, before deliberations began, P.P. told her, L.B., and T.M. that "he was going to vote guilty no matter what."  On another occasion, P.P. explained to T.M. why he thought defendant was guilty.  On cross-examination, D.A. admitted committing misconduct.  The prosecutor also asked about discrepancies in her testimony and placed into evidence an audio recording of D.A. telling a defense investigator that P.P. said, "no matter what happens, I'm going in there and vote guilty the first . . . time I vote because just in case."  The

*(Footnote continued from previous page.)*

Amendment issue in these circumstances (see *Juror Number One v. Superior Court* (2012) 206 Cal.App.4th 854, 865 [rejecting the Fifth Amendment claim as speculative]) and lacking some articulation of a crime the jurors may have committed, the court's decision to proceed in this fashion threatened to undermine its ability to acquire complete and accurate information, untainted by jurors' now-heightened concerns about their own interests. (See *People v. Tuggles* (2009) 179 Cal.App.4th 339, 380 ["When a defendant makes a prima facie showing of juror misconduct, the trial court must conduct a hearing . . . 'to determine the truth of the allegations.' "].)  Because we reverse the judgment for prejudicial juror misconduct, however, we have no occasion to pass on the propriety of the court's decision to proceed in this manner.

investigator asked D.A. what was meant by "just in case," and D.A. said she "assum[ed] just in case we all said not. . . . You know because he wanted to discuss it . . . I don't know if he was dead set on guilty . . . ."

L.B. testified that she drove P.P. home from court almost every day beginning in the second week of the trial. During their commute, P.P. "consistently said that the defendant was guilty." On one occasion, L.B. went to lunch with P.P. and D.A. P.P. said "he was probably going to be arguing with [D.A.] during the [eventual] deliberations because they were at opposite sides." P.P. later called L.B., an alternate juror, during deliberations. He reported that "things weren't going well," he relayed the vote count, he said that D.A. was upset, and expressed his belief that he should have been the foreman. Before deliberations, P.P. frequently said he was going to vote guilty. Although he said "he would listen to what the others said," "he felt it was guilty, because he had to believe what Nelva Bell said." On cross-examination, L.B. admitted committing misconduct.

T.M. testified other jurors, including P.P., discussed the case before deliberations. In her opinion, P.P. prejudged defendant's guilt before the case was submitted to the jury. After deliberations began, P.P. said he thought D.A. was "mad at me because I think — I think [defendant's] guilty."

A.G., G.S., M.K., former Alternate Juror No. 3 (J.A.) (who replaced Juror No. 2 (C.S.)), along with Juror Nos. 4, 6, 7, and 9-12 testified they did not hear other jurors discuss the case outside the jury room.

P.P. first testified he did not hear jurors discuss the case outside of the jury room or before deliberations. He subsequently admitted discussing the case on numerous occasions with other jurors, including D.A. and L.B. He admitted telephoning L.B. during deliberations. In explaining his lies, he said he thought his conversations were "unimportant," and he did not want to get anyone in

10

trouble. He initially denied making statements about defendant's punishment or prejudging his guilt. He later admitted that, although he did not remember saying defendant was guilty, he might have done so. He also admitted telling others before deliberations that he believed Bell's testimony. When asked if he ever told L.B. and D.A. that he was going to vote guilty once deliberations began, P.P. testified that it was possible, but he did not remember. P.P. testified he consistently voted for guilt. On cross-examination by the prosecutor, P.P. testified he only formed an opinion on guilt after watching Bell's recorded hospital interview at the conclusion of the prosecutor's rebuttal. Only then did he express an opinion to D.A. and L.B. P.P. also testified he participated in deliberations and listened to the readback of testimony.

At a March 28 hearing, the trial court found P.P. committed "serious misconduct," but concluded it did "not rise to the level that there is a substantial likelihood [of bias]."[7] The court acknowledged its initial view was to the contrary, but noted that evidence had been presented that P.P. engaged in deliberations, was not "dead set" on guilt, and only voted initially for guilt to see what others had to say. The court determined neither P.P. nor D.A. "ha[d] a lot of credibility." It found that, before deliberations began, P.P. decided that his *first vote* would be guilty, but he would thereafter listen to the other jurors and engage in deliberations. The court found D.A.'s tape-recorded statement and L.B.'s testimony to be the most compelling evidence concerning P.P.'s intentions. The court noted P.P. did not arrive at the court with a formed opinion and based his

---

[7] As we explain below (see *post*, at pp. 12, 15), the court misinterpreted the manner in which the analysis is to proceed.

11

opinion only on the evidence presented at trial.[8]  It also noted that the jury asked for a readback of testimony, which it considered evidence that the jury was deliberating.  The court denied the motion for a new trial.[9]

Defendant contends overwhelming evidence establishes P.P. committed prejudicial misconduct, and reversal is required.  We agree.

A criminal defendant "has a constitutional right to a trial by unbiased, impartial jurors.  [Citations.]"  (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*).)  That means "12, not 11, impartial and unprejudiced jurors.  '. . . [A] conviction cannot stand if even a single juror has been improperly influenced.' "  (*People v. Holloway* (1990) 50 Cal.3d 1098, 1112.)  Jurors must be admonished not to "form or express any opinion about the case until the cause is finally submitted to them."  (§ 1122, subd. (b).)  Prejudgment "constitute[s] serious misconduct" (*People v. Brown* (1976) 61 Cal.App.3d 476, 480), raising a presumption of prejudice.  The presumption is rebutted "if the entire record . . . indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant."  (*In re Hamilton* (1999) 20 Cal.4th 273, 296.)  "On appeal, . . . whether jury misconduct was prejudicial presents a mixed question of law and fact ' "subject to an appellate court's independent determination." ' [Citation.]  We accept the trial

---

**8**     These two conclusions appear to be a makeweight by the trial court.  The fact that P.P. did not engage in *other* kinds of misconduct is of little help in resolving whether the misconduct actually committed was prejudicial.

**9**     The trial court also cited (1) P.P.'s testimony that his premature opinion about guilt was "reinforced" by Bell's videotaped hospital interview, which was played at the end of the trial, and (2) D.A.'s failure to "articulate any evidence or opinion" that P.P.'s misconduct "influenced her [vote] one way or the other."  Because the parties do not address whether such evidence was inadmissible under Evidence Code section 1150, we express no opinion on that issue.

court's factual findings and credibility determinations if supported by substantial evidence." (*People v. Tafoya* (2007) 42 Cal.4th 147, 192 (*Tafoya*).)

The trial court heard testimony concerning P.P.'s premature decision to vote guilty. Some jurors testified P.P. intended to vote guilty on the first ballot; others testified he intended "to vote guilty no matter what," indicating an intent to vote guilty on all ballots, regardless of the views of others. Although these two accounts are not necessarily inconsistent, the court ultimately found that P.P. decided to vote guilty *initially* in order to ensure defendant would not be acquitted at the outset, but that he thereafter participated in deliberations. The court cited D.A.'s tape-recorded statement and L.B.'s testimony as the most persuasive evidence of P.P.'s intent. We defer to this factual finding. Nevertheless, in light of the uncontroverted evidence of multiple other forms of recurring and serious misconduct, and applying the proper prejudice analysis, we conclude that the entire record does not eliminate a reasonable probability of prejudice.

It is undisputed that P.P. repeatedly talked about the case outside deliberations. He did so in direct defiance of the trial court's repeated admonitions.[10] He discussed the case during his daily commute, at lunch, during cigarette breaks, in court hallways, and in elevators.[11] He telephoned non-deliberating jurors during deliberations, reporting what was occurring in the jury room. Multiple jurors testified that, long before the prosecution rested its case,

---

[10] At oral argument, defense counsel noted that the trial court fully admonished the jury for the first several days of trial. It thereafter reminded the jury daily to "remember the admonitions." Given the length of the trial, the jurors were admonished scores of times.

[11] The trial court never made a finding concerning which juror the anonymous caller had referred to. It did note, however, that P.P. most closely fit the caller's description.

P.P. conveyed a belief in defendant's guilt. (See *People v. Brown*, *supra*, 61 Cal.App.3d at p. 480.) He also told jurors, both before and during deliberations, that defendant deserved the death penalty, indicating that his mind was made up regarding guilt. Jurors testified that, *on the first day of trial*, P.P. stated that Bell's testimony was dispositive on guilt. These statements "require[] neither interpretation nor the drawing of inferences. [They are] flat, unadorned statement[s] that [P.P.] prejudged the case long before deliberations began and while a great deal more evidence had yet to be admitted." (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 794.)

There is also no dispute that P.P. prematurely reached a firm conclusion concerning the veracity of Bell's testimony. Indeed, P.P. admitted telling other jurors before deliberations that he believed Bell. Several jurors testified that, after hearing Bell's testimony on the first day of trial, P.P. said "there should be nothing else," "there was no denying Nelva Bell's testimony," and that "he had to believe what Nelva Bell said." He expressed these opinions long before the prosecution finished its case and before the defense was able to present any evidence in rebuttal.[12]

The evidence also establishes that P.P. abandoned the role of an impartial juror, adopting the mantle of an advocate.[13] He repeatedly told the other jurors that defendant was guilty, that he deserved the death penalty, and that Bell's

---

[12] During the guilt phase, the defense focused a substantial part of its own case on undermining Bell's testimony. It noted the lack of physical evidence implicating defendant, offered evidence that Bell was under the influence of cocaine during the crimes, and presented expert testimony concerning the unreliability of eyewitness identification and the effect of crack cocaine on a user's perception.

[13] The jurors were instructed to "[r]emember that you are not partisans or advocates in this matter. You are impartial judges of the facts."

14

testimony was dispositive. Before deliberations, he explained to T.M. *why* defendant was guilty. P.P. said he expected to "battle" D.A. during deliberations "because they were at opposite sides." P.P. telephoned L.B. during deliberations, reporting that "things weren't going well" and D.A. was upset. He also told T.M. that D.A. was angry with him because he thought defendant was guilty. Consistent with this evidence, the trial court noted that P.P. "was trying *to lobby* [the other jurors] to vote guilty before the deliberations even started." P.P.'s conduct was not only improper in itself, it also was inconsistent with his asserted intent to maintain an open mind during deliberations. Even deferring to the court's conclusion that P.P. only intended to vote guilty on the first ballot to ensure ongoing deliberations, P.P.'s transformation from impartial fact finder to combative advocate before deliberations began is separate and serious misconduct.[14] The court's rejection of defendant's new trial motion fails to address this independent source of presumed bias.

The trial court found that P.P. engaged in serious misconduct. It thereafter concluded, however, that "[t]here [was] no evidence of actual bias on the part of [P.P.]" and that his misconduct "[did] not rise to the level that there is a substantial likelihood [of bias]." This formulation has it backward. Once a court determines a juror has engaged in misconduct, a defendant is presumed to have suffered prejudice. (*In re Hamilton*, *supra*, 20 Cal.4th at p. 295.) It is for the *prosecutor* to rebut the presumption by establishing there is "no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Id.* at p. 296.)

Whether P.P.'s "misconduct was prejudicial presents a mixed question of law and fact ' "subject to an appellate court's independent determination." ' "

---

[14] We do not imply that jurors who argue forcefully for an outcome once deliberations begin act improperly.

(*Tafoya*, *supra*, 42 Cal.4th at p. 192.) Given the nature, scope, and frequency of P.P.'s misconduct, along with his repeated and admitted untruthfulness on a variety of topics, the People have not discharged their burden. Accordingly, "we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict, because a biased adjudicator is one of the few structural trial defects that compel reversal without application of a harmless error standard. [Citation.]" (*Nesler*, *supra*, 16 Cal.4th at p. 579.)

## III. DISPOSITION

In light of the prejudicial juror misconduct, we reverse the judgment.


**CORRIGAN, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**RUVOLO, J.  \***

_____

\*      Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Weatherton

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S106489
**Date Filed:** July 7, 2014

_____

**Court:** Superior
**County:** Riverside
**Judge:** James S. Hawkins

_____

**Counsel:**

Lisa Short and Michael R. Snedeker, under appointments by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Adrianne S. Denault, Robin Urbanksi and Daniel Rogers, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael R. Snedeker
Snedeker, Smith & Short
PMB 422
4110 SE Hawthorne Boulevard
Portland, OR  97214-5246
(503) 234-3584

Daniel Rogers
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2283