Filed 10/8/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>MICHAEL ANTHONY FLORES,<br><br>　　　　Defendant and Appellant. | C089569<br><br>(Super. Ct. No. STKCRFE20170000102) |

APPEAL from a judgment of the Superior Court of San Joaquin County, Richard M. Mallett, Judge. Reversed.

Gillian Black, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Michael Anthony Flores was found guilty of voluntary manslaughter, among other crimes, after the jury initially declared it was unable to reach a unanimous verdict. Defendant moved for a new trial based on evidence the jury considered defendant's sentence in determining the verdict. The jurors' declarations in support of the new trial motion showed the jury was at an impasse between second degree murder and voluntary manslaughter and shortly after discussing the possibility defendant would "walk" if it were to hang, the jury found defendant guilty of voluntary manslaughter. The

1

trial court denied defendant's new trial motion, finding inadmissible any evidence of the jury's deliberations regarding punishment and that discussing punishment during deliberations is not misconduct.

We reverse because: (1) the trial court erred in finding inadmissible the entire contents of the jurors' declarations submitted in support of the new trial motion; (2) consideration of the admissible portions of the jurors' declarations establish misconduct occurred, raising a rebuttable presumption of prejudice; and (3) the People failed to rebut the presumption of prejudice.

FACTUAL AND PROCEDURAL BACKGROUND

A

*The Charges And Trial*[1]

On December 29, 2016, defendant was living at his girlfriend's (Jessica T.) mom's house. That night, his girlfriend's sister (Cheyenne T.) and her boyfriend (Dallas Taylor), who both also lived at that house, got into an argument and Taylor decided to move out. As Taylor was packing his belongings in the room he shared with Cheyenne T., an argument erupted between the house's residents, Taylor, and Taylor's family who had come to help him move out. Jessica T. entered the room and started struggling with Taylor; she was knocked to the ground. Defendant entered the room at some point during this struggle and shot Taylor. Taylor died at the scene from a gunshot wound. Defendant fled the house and turned himself in to the police the following day.

Defendant was charged with murder -- with associated enhancements that defendant had personally and intentionally discharged a firearm causing death and had personally used a firearm -- illegal firearm possession, and child endangerment -- with an associated enhancement that defendant had personally used a firearm.

---

[1] Because the facts underlying the crime are largely irrelevant to the issue on appeal, we provide a very brief summary of the evidence produced at trial.

2

Defendant's trial began on January 23, 2018, and the jury began deliberations on March 6, 2018.[2] For count 1, the murder charge, the jury was instructed on first degree murder, second degree murder, and voluntary manslaughter. The jury was also instructed on its duty to decide "what happened, based only on the evidence that has been presented to you in this trial" and that it had to reach a verdict "without any consideration of punishment."

On March 13, the jury sent a note asking: "Can we determine count 2 or 3 without a consensus on count 1. We all agree there is a crime of murder, but we cannot reach a decision on 2nd/vs. manslaughter." On March 14, the trial court reconvened the jury and the foreperson informed the court the jury was in an eight-to-four split on the murder count between second degree murder and voluntary manslaughter. The court then dismissed a juror for misconduct (which has no bearing on this appeal), seated a new juror, D. R., and instructed the jury to restart deliberations.

On March 15, the jury sent three more notes: the first was sent at 11:20 a.m. stating, "[w]e are at an impass[e]"; the second at 1:35 p.m. stating, "[w]e have reached a verdict on Counts 1 and 2; however we need some time to ponder Count 3"; and finally at 2:05 p.m. stating it had reached verdicts on all counts. Later that day, the jury found defendant not guilty of first and second degree murder, guilty of voluntary manslaughter, illegal firearm possession, and child endangerment, and found true the two personal use of a firearm enhancements as to the murder and child endangerment charges.

---

[2] All further date references are to 2018.

## B

### *The Motion For A New Trial*

On February 19, 2019, defendant moved for a new trial. Defendant argued, in part, that there was prejudicial jury misconduct deriving from the consideration of his potential sentence and his alleged criminal gang affiliation.

All 12 jurors provided declarations. On the issue of impasse, the declarations generally showed the jurors were becoming frustrated as to the eight-to-four split regarding the degree of the murder charge and began discussing the possible consequences if the jury were to hang on that count. This included speculation that the prosecution would not retry the case and defendant could "walk" and avoid all responsibility for killing Taylor. Jurors made statements to the entire group that " 'maybe he won't get retried. Maybe it would be too much. How much will they pay on this case?' "

Some jurors declared the discussion regarding sentencing occurred up to lunch on March 15, and that after lunch the eight jurors who were voting for second degree murder switched to voluntary manslaughter to avoid a hung jury. Juror G. H. declared she was "the only juror who did not want to drop her vote and she was upset at the thought of this compromise," but after lunch she "told the rest of the jury that she agreed with their [*sic*] thinking and changed her vote to voluntary manslaughter in order to avoid a hung jury."

Juror C. K. declared she suspected some of the jurors did outside research regarding sentencing for voluntary manslaughter but that "discussion got shut down by the Foreman who reminded them that they could not discuss or consider sentencing." C. K.'s declaration did not state when this admonition was given.

Jurors D. D. and M. S. declared the newly seated juror D. R., who was a correctional officer, was particularly vocal on the need for agreement. They further declared another juror, R. N., had said if the jury was "unable to reach a unanimous verdict then no one would be held accountable." D. D. declared D. R. agreed with R. N.,

4

saying, "based on his experience as a correctional officer, he knows [defendant] 'will do it again' and . . . confirmed [R. N.'s] statement that, based on his experience, if there was a hung jury then no one would be held accountable. [D. R.] explained that he was willing to compromise at manslaughter in order to avoid a hung jury." D. R. also allegedly explained the minimum and maximum sentences for manslaughter. M. S.'s declaration was largely consistent with D. D.'s declaration regarding D. R.'s statements.

D. R.'s own declaration provided that, based "on his experience and knowledge of being a Lieutenant for the California Department of Corrections and Rehabilitation, [he] knew the law and in his mind [defendant] was guilty of second degree murder." He detailed his conversation with another juror who would not budge from voluntary manslaughter, during which he tried to give the other juror "examples, threat assessments, and scenarios of similar circumstances, but [the other juror] just would not agree with him and this frustrated [D. R.] because [D. R.] knew the law." D. R. also declared that before lunch on March 15, D. D. said he was going to vote not guilty, so the foreperson would declare a hung jury. D. R. declared he told the other jurors "he would hate to have a hung jury or have to retry the case" but he was "willing to drop down to voluntary manslaughter, even though he did not agree, because in his heart and based on what he believed the law to be, [defendant] should be convicted of second degree murder." D. R. explained he was concerned about defendant "walking" because "he did not know the law completely in that aspect." He, however, could not recall whether the concern that the district attorney would not retry defendant was said out loud. He further declared everyone agreed on voluntary manslaughter after lunch, though "[t]wo female jurors that [*sic*] were in favor of second degree murder began crying and took the longest to drop down to voluntary manslaughter."

As to the gang affiliation enhancement, the jurors declared there was a discussion about whether defendant's tattoo and the color of the shirt he wore during the incident indicated he was a gang member. Several jurors declared that D. R. said the tattoo and

5

shirt color were gang related, with D. D. declaring, "[t]he correctional officer stated that he had personal knowledge that the tattoo was gang related and that there was even a song about it." One juror declared this issue was quickly dropped "because there was no information that was brought up at trial about any of them being involved in gangs." And the jury foreperson said he reminded the group that defendant's "gang membership was irrelevant." Several of the jurors declared they did not take this evidence into account.

The prosecution's opposition to the new trial motion was supported by evidence that juror M. S. was biased toward defendant. Telephone transcripts from jail after trial showed M. S. called defendant to tell him she was "truly, truly, falling in love with [him]." She also said she could not show any emotions toward him in court "because then the [prosecutor] would say oh she's got to go" and that "would be a tremendous loss for you on the trial a fact that you know I was one (unintelligible) going for self[-]defense."

On May 20, 2019, the trial court denied defendant's new trial motion. The trial court found the "few brief comments about the future of the case, what would happen if it's a hung juror [*sic*], what would the punishment be" were "ruminations." The trial court held such statements and the statements about a compromise verdict were all inadmissible under Evidence Code section 1150 as evidence of the jurors' thought processes. Citing several cases, the trial court also found that the discussions regarding sentencing and a possible compromise verdict did not constitute misconduct. And it found M. S.'s declaration not credible based on the evidence of her affection for defendant.

The trial court did, however, find the discussions regarding defendant's possible gang affiliation constituted misconduct. This misconduct, it concluded, was not prejudicial because it was "innocuous," limited to "a shirt and some tattoos," took place during a multiday deliberation, and the foreperson properly admonished the jury that defendant's possible gang affiliation was irrelevant. The trial court also noted the

6

"exhaustive amount of evidence" in favor of the verdict and that a review of the entire record supports the finding defendant received a fair trial.

C

*Sentencing*

At the same hearing during which it denied defendant's new trial motion, the trial court sentenced defendant to a total of 25 years 8 months in prison, comprised of: 11 years (upper term) for voluntary manslaughter, 10 years (upper term) for the firearm use enhancement, three years (upper term) for illegal firearm possession, stayed under Penal Code[3] section 654, 16 months (one-third midterm) for child endangerment, and three years four months (one-third midterm) on the second personal use of a firearm enhancement. The trial court also imposed three $30 criminal conviction fees (Gov. Code, § 70373), three $40 court operations assessments (§ 1465.8), a $10,000 restitution fine (§ 1202.4, subd. (b)), a suspended $10,000 parole revocation fine (§ 1202.45), and $9,930 in direct victim restitution. Defendant's abstract of judgment also indicates a "Surcharge" of $1,000.

DISCUSSION

Defendant first contends there was prejudicial misconduct based on D. R.'s statements to the other jurors, attesting his knowledge of the law given his position as a correctional officer. The People contend any evidence regarding the reasoning for changing votes is either inadmissible or does not show misconduct occurred. We conclude the jury improperly considered possible punishment, which prejudiced defendant. We must reverse for that reason.[4]

---

[3]     Undesignated statutory references are to the Penal Code.

[4]     We therefore do not address defendant's two additional arguments that: (1) the trial court erred in finding the jury's consideration of his possible gang affiliation was not prejudicial; and (2) the $1,000 "Surcharge" must be stricken.

Courts evaluate a motion for a new trial based on jury misconduct in three steps: (1) determine what evidence is admissible; (2) if there is admissible evidence, decide if it establishes misconduct; and (3) if there is misconduct, determine whether it was prejudicial. (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.)

## I

### *The Trial Court Erred In Finding The Entirety Of*
### *The Jurors' Declarations Were Inadmissible*

We first determine what evidence is admissible. Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." " 'This statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved." ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1281.) Juror's statements " 'must be admitted with caution,' because '[s]tatements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors.' [Citation.] But statements made by jurors during deliberations are admissible under Evidence Code section 1150 when 'the very making of the statement sought to be admitted would itself constitute misconduct.' " (*People v. Cleveland* (2001) 25 Cal.4th 466, 484.)

Like any other issue of admissibility, we review the trial court's determination for abuse of discretion. (*Barboni v. Tuomi*, *supra*, 210 Cal.App.4th at p. 345.)

Many statements in the jurors' declarations are inadmissible. Why a juror did or did not change his or her vote, and his or her subjective understanding of the punishment

discussions are evidence of internal thought processes and therefore inadmissible. But the statements indicating that sentencing discussions took place among the jurors during deliberations, including how punishment should factor into the verdict for the murder charge, are admissible. Such discussions were out loud, heard by all the jurors, and involved information that could have influenced the verdict. This covers both the evidence of general discussions about punishment and the specific statements made by individual jurors to the entire panel about what should be considered, including D. R.'s statement that he knew, based on his personal knowledge and experience as a correctional officer, defendant would "walk" if the jury were to hang. The statements are not evidence as to the effect these statements had on any juror's mental processes or why he or she may or may not have changed his or her vote, but rather constitute objective information the jurors were considering during deliberations.

We must accept the trial court's determination that M. S. was not reliable, and thus we do not consider her declaration. But the admissible evidence did not derive solely from her declaration. To the contrary, nine other jurors affirmatively declared[5] the jury discussed whether its inability to unanimously agree on the murder count could affect defendant's punishment, and D. D.'s declaration specifically detailed comments made by D. R. to the entire panel of jurors.

There is also admissible and relevant evidence to support defendant's argument beyond the statements contained in the jurors' declarations. The foreperson said in open court on March 14 that the jury was at an impasse as to the murder charge. The court

---

**5**     The two other jurors, S. M. and R. N., did not affirmatively declare these discussions did not happen. S. M. declared she changed her vote because she "believed if the jury was hung, [defendant] would 'walk,' " which is inadmissible, but she did not say whether the group discussed this issue together. R. N. similarly provided his reason for changing his vote and when asked by the defense investigator if the jury discussed whether defendant "would walk free," R. N. responded "that may have been said . . . I don't really remember that but along those lines."

then sat D. R. on the jury after dismissing another juror for misconduct. The next day, the jury sent a note that it was still at an impasse before lunch and then another note just over two hours later that it was able to reach a verdict on the murder charge. This additional objective evidence supports the timing of the discussions as reflected in the declarations.

The jurors' declarations as to the statements made during deliberations regarding punishment are also admissible because "the mere making of such a statement in the jury room was an overt act of misconduct and admissible as such under Evidence Code section 1150." (*People v. Johnson* (2013) 222 Cal.App.4th 486, 495.) And this evidence is necessary to establish this type of misconduct. Without evidence of what the jury did or did not consider as a group, a verdict could never be challenged on the basis the jury considered impermissible factors in reaching the verdict. (See *People v. Avila* (2009) 46 Cal.4th 680, 726-727 [analyzing comments made during deliberation indicating jury may have discussed defendant's decision not to testify].)

The trial court therefore abused its discretion in finding the entire contents of the jurors' declarations constituted inadmissible evidence and could not establish misconduct occurred as to the discussions of punishment.

II

*Jury Misconduct Occurred*

We now examine the admissible evidence to determine whether there was jury misconduct. "[I]n cases not involving the death penalty, it is settled that punishment should not enter into the jury's deliberations." (*People v. Engelman* (2002) 28 Cal.4th 436, 442; Bench Notes to CALCRIM No. 101 (Apr. 2020 ed.) p. 7 ["You must reach your verdict without any consideration of punishment"].) "It is fundamental that the trier of fact, be it court or jury, must not consider the subject of penalty or punishment in arriving at its decision of guilt or innocence." (*People v. Moore* (1968) 257 Cal.App.2d 740, 750.) Sentencing ramifications are "irrelevant to the jury's factfinding function" in

10

a noncapital case. (*People v. Ruiloba* (2005) 131 Cal.App.4th 674, 692.) That is because "knowledge of the permitted or statutorily required punishment may cause or influence the jury to return a verdict designed to result in a particular penalty, rather than one based on the facts and applicable law of a case." (*People v. Moore* (1985) 166 Cal.App.3d 540, 551.)

"On review from a trial court's 'determin[ation of] whether misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*Barboni v. Tuomi*, *supra*, 210 Cal.App.4th at p. 345.)

The consideration of defendant's potential punishment during the guilt phase was misconduct. As the jury here was instructed, it was responsible for rendering a verdict based on the evidence presented at trial. Consideration of punishment, cost of retrying the case, prosecutorial strategy, and any other postverdict concerns are irrelevant to this duty and it was therefore misconduct for the jury to consider defendant's potential punishment in reaching its verdict.

The cases the trial court relied upon to find otherwise are inapplicable because those cases dealt with a consideration of future punishment during *the penalty phase* of trial. (Citing *People v. Schmeck* (2005) 37 Cal.4th 240, abrogated on other grounds by *People v. Mckinnon* (2011) 52 Cal.4th 610; *People v. Riel* (2000) 22 Cal.4th 1153; *People v. Pride* (1992) 3 Cal.4th 195; *People v. Cox* (1991) 53 Cal.3d 618.) For example, in *Riel*, a juror said during penalty phase deliberations: " ' "If we give him the death penalty, the judge will just commute it to life in prison anyway." ' " (*Riel*, at p. 1218.) Our Supreme Court found the trial court did not err in denying the motion for a new trial because this statement "was merely the kind of comment that is probably unavoidable when 12 persons of widely varied backgrounds, experiences, and life views join in the give-and-take of deliberations. Not all comments by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But such comments cannot

11

impeach a unanimous verdict; a jury verdict is not so fragile. 'The introduction of much of what might strictly be labeled "extraneous law" cannot be deemed misconduct.' " (*Id.* at p. 1219.)

In the penalty phase of capital cases, the jury is considering the appropriate punishment based on guilt previously established. (§ 190.3 ["If the defendant has been found guilty of murder in the first degree . . . the trier of fact shall determine whether the penalty shall be death or confinement in state prison for a term of life without the possibility of parole"].) Speculating whether a defendant might be released earlier is relevant to the jury's duty of determining the appropriate punishment. (See *People v. Engelman*, *supra*, 28 Cal.4th at p. 442; CALCRIM No. 101 (Apr. 2020 ed.) p. 7 ["When giving this instruction during the penalty phase of a capital case, the court . . . should also delete the following sentence: 'You must reach your verdict without any consideration of punishment' "].) In contrast, the jury's discussions about sentencing during the guilt phase of defendant's trial were in no way relevant to its duty to render a verdict. (See *People v. Echavarria* (2017) 13 Cal.App.5th 1255, 1267 [one factor in considering misconduct is "whether the jury was discussing an issue within the scope of [its] duties, e.g., discussing sentence information during penalty deliberations or during guilt deliberations"].)

The trial court also failed to consider that the jury had been explicitly instructed to not consider punishment. Not following instructions is itself a form of jury misconduct. (*People v. Engelman*, *supra*, 28 Cal.4th at p. 442 ["the jury must follow the court's instructions, 'receiv[ing] as law what is laid down as such by the court' "]; *People v. Lavender* (2014) 60 Cal.4th 679, 687 ["The violation of the court's instructions constituted misconduct"].) The trial court therefore erred in finding the discussions regarding punishment during the guilt phase were not misconduct.

To the extent the trial court made a factual finding that no evidence existed of misconduct, the finding is unsupported. Again, nine of the jurors' declarations, other

12

than M. S.'s declaration, stated unequivocally the jury discussed as a group whether defendant could "walk" and avoid punishment if the jury could not reach unanimity on the murder charge. This was not limited to M. S.'s declaration, as the court implied.

The trial court's determination that there was no misconduct as to the punishment discussions was both legally incorrect and lacked substantial evidence.

## III

### *Defendant Was Prejudiced*

The final and dispositive issue is whether the misconduct is sufficiently prejudicial to warrant reversal. Jury misconduct " 'creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred.' " (*People v. Williams* (2006) 40 Cal.4th 287, 333; *People v. Lavender*, *supra*, 60 Cal.4th at p. 687.) The presumption can be rebutted "by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct." (*Lavender*, at p. 687.) This analysis has also been phrased as: "The presumption is rebutted 'if the entire record . . . indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' " (*People v. Weatherton* (2014) 59 Cal.4th 589, 598; *People v. Hardy* (1992) 2 Cal.4th 86, 174 [the presumption is rebutted if "upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm"].)

"It is settled that 'unless the prosecution rebuts that presumption by proof that no prejudice actually resulted, the defendant is entitled to a new trial.' " (*In re Stankewitz* (1985) 40 Cal.3d 391, 402.) But there is an additional hurdle to overturn a verdict where jury misconduct is based on the consideration of extraneous evidence. As our Supreme Court has stated: "Speaking in reference to the introduction of extraneous material to jurors, we explained: 'The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find

13

bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test.' " (*People v. Williams*, *supra*, 40 Cal.4th at pp. 333-334.)

As to this additional hurdle, we note the misconduct here involved the inappropriate consideration of whether defendant would "walk" if the jury were to hang. This included discussion of some extraneous evidence, such as D. R.'s assertion defendant would "walk" based on his experience as a correctional officer, but this evidence had no bearing on the actual guilt of defendant. The discussion itself was wholly irrelevant to the duty to decide guilt. This type of misconduct is different from a discussion of extraneous evidence presented on a relevant issue within the scope of the jury's duty and is likely to mislead the jury in determining the issue of guilt or innocence based on improper considerations. (*People v. Allen* (1973) 29 Cal.App.3d 932, 936-937 ["improper reference to penalty or punishment is generally held reversible because such references are irrelevant, the jury is likely to be misled in determining the issue of guilt or innocence upon the basis of such improper considerations"].)

For the People to avoid reversal in this case, the presumption of prejudice must be rebutted either by an affirmative evidentiary showing that prejudice does not exist or by our examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct. If either of these is not satisfied, we must reverse.

There are several factors and events courts consider in evaluating whether prejudice does not exist or actual harm was reasonably probable: the "nature, scope, and frequency" of the misconduct (*People v. Weatherton*, *supra*, 59 Cal.4th at p. 600; *People v. Solorio* (2017) 17 Cal.App.5th 398, 409); if the jury was readmonished against the

14

misconduct (*People v. Lavender*, *supra*, 60 Cal.4th at p. 687); if "the misconduct goes to a key issue in the case" (*In re Stankewitz*, *supra*, 40 Cal.3d at p. 402); and the apparent authority of the source of the misconduct (*ibid*. ["he vouched for its correctness on the strength of his long service as a police officer"]).

" 'On appeal, . . . whether jury misconduct was prejudicial presents a mixed question of law and fact " 'subject to an appellate court's independent determination.' " [Citation.] We accept the trial court's factual findings and credibility determinations if supported by substantial evidence.' " (*People v. Weatherton*, *supra*, 59 Cal.4th at p. 598.)

There is no affirmative evidence prejudice does not exist. This issue was not addressed below because the trial court did not find misconduct on this issue. The People here make several arguments; none have merit. First, they argue the only evidence of prejudice could derive from M. S.'s declaration. For the reasons already discussed *ante*, this is incorrect -- nine other jurors' declarations attested that these discussions occurred. Next, the People point to the ample evidence supporting the conviction. This is not a relevant consideration because whether voluntary manslaughter was supported by substantial evidence can have no bearing on whether the jury agreed to voluntary manslaughter for reasons *other than the evidence* presented at trial. Finally, the People assert each juror had already decided defendant was guilty of a crime before the jury discussed possible punishment and thus the statements about punishment could not have prejudiced defendant. This argument ignores the critical importance of selecting the appropriate degree of murder. Second degree murder carries a higher punishment and it was the jury's duty to unanimously agree on a crime given the evidence presented at trial. And to the extent the People suggest defendant benefited from the lesser conviction, this too must be rejected: "in the context of prejudice, a mistrial is a better outcome than a conviction" (*People v. Hem* (2019) 31 Cal.App.5th 218, 230). The People therefore failed to rebut the presumption of prejudice.

15

A full review of the record further confirms that, not only is there a lack of affirmative evidence of no prejudice, but there is a reasonable probability defendant was actually harmed. Without considering the statements regarding why the eight jurors changed their minds, the admissible evidence shows that the jury was at an eight-to-four impasse between second degree murder and voluntary manslaughter, with the majority in favor of second degree murder. Frustrated by the impasse, the jury then veered into a forbidden discussion regarding whether defendant would avoid punishment if it could not unanimously agree on the murder count. These discussions were not related to the evidence of the crimes, but the potential consequences if it continued to disagree. These discussions also involved a key issue of the case -- the appropriate degree for the murder count, the primary charge against defendant. (*People v. Solorio*, *supra*, 17 Cal.App.5th at p. 409 ["Jury misconduct in this case went directly to the ultimate issue -- [defendant's] guilt for murder"].)

On March 15, before lunch, the foreperson said during deliberations that he was going to declare a hung jury. D. R. then said he would vote for voluntary manslaughter, not because he agreed defendant was guilty of that crime, but because "he would hate to have a hung jury or have to retry the case." Not taking this for evidence of his actual thought process, the statement is properly considered as evidence the jury was making inappropriate considerations at a crucial point in deliberations. Shortly after this was said, the jury went to lunch. G. H. told the other jurors after lunch she was changing her vote to avoid a hung jury, even though she was upset about it. Again, this is evidence the jury was considering punishment both before and after lunch. The impasse was then resolved and the jury unanimously voted to convict defendant of voluntary manslaughter. The timing of the inappropriate discussions and resolution of the impasse indicates more than a reasonable probability defendant was harmed by the misconduct.

The jury also does not appear to have been readmonished on this issue. One juror's declaration stated the foreperson reminded them that they could not discuss or

16

consider sentencing. But it is unclear when this admonishment occurred. And given the proximity of the discussions to the rendering of the verdict, the admonition does not appear to have had any effect on the jury, especially considering it had already been instructed to not consider punishment in the jury instructions. (See *People v. Hem*, *supra*, 31 Cal.App.5th at p. 230 [presumption jury follows admonitions "already dispelled by the fact that four jurors were violating their instruction not to discuss the case without all jurors being present"].) Any deficiency in the evidence to establish when this admonishment occurred is the People's burden to overcome. (*People v. Echavarria*, *supra*, 13 Cal.App.5th at p. 1269 ["The lack of evidence offered by the People means there has not been a rebuttal of the presumption of prejudice"].)

Finally, D. R.'s apparent authority further indicates a strong possibility of actual harm. D. D.'s declaration stated D. R. told the group he had expertise as a correctional officer and said, based on this expertise, he knew defendant would "walk" if the jury were to hang. D. R. even admitted to trying to convince D. D. to change his vote using tools of a correctional officer -- "examples, threat assessments, and scenarios of similar circumstances." Though D. R. said he was unsure of the law on what would happen if the jury were to hang, there is no evidence he expressed this equivocation to the other jurors.

The evidence of serious misconduct is strong. (Cf. *People v. Echavarria*, *supra*, 13 Cal.App.5th at pp. 1262, 1268-1272 [convictions and enhancements reversed based on a single juror's declaration that a juror changed his vote from second degree murder to first degree murder based on another juror's statement that "she had worked in a prison and that defendant 'could "walk tomorrow" with time served' if he were convicted of second degree murder, but he 'would be far less likely to get time served on a conviction for first degree murder' "].) Not including M. S., nine jurors attested to the discussions of punishment during guilt deliberations, which occurred immediately prior to the unanimous verdict and were instigated by someone "who appeared to have some

17

authority on the subject." (*Id.* at p. 1267.) It can reasonably be inferred that D. R. was biased by his experience and shared his perspective to increase the punishment on defendant by avoiding a hung jury. It further appears *seven other jurors* changed their votes based on this information.

The People have not carried the burden to dispel the presumption of prejudice from jury misconduct because there is more than a reasonable probability defendant was actually harmed by the misconduct. Put a different way, we cannot say there was no substantial likelihood that defendant suffered actual harm. The possibility the jury rendered its verdict not because of defendant's actual guilt of voluntary manslaughter but because of secondary considerations beyond the scope of the its duty justifies reversal.

DISPOSITION

The judgment is reversed.


/s/_____<br>Robie, J.


We concur:


/s/_____<br>Blease, Acting P. J.


/s/_____<br>Duarte, J.