Filed 11/18/24  P. v. Barajas CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE ANTONIO BARAJAS,<br><br>    Defendant and Appellant. | H049954<br>(San Benito County<br> Super. Ct. No. CR1801009) |

Jose Antonio Barajas was charged with murder, attempted murder, kidnapping, and shooting at an occupied vehicle based on an incident in which he shot at a car driven by a romantic rival, Gabriel Orozco.  In the first of two trials in this case, the jury convicted Barajas of shooting at an occupied vehicle, acquitted him of two counts of attempted murder, but failed to reach a verdict on the remaining charges, resulting in a mistrial on those charges.  In the second trial, the jury convicted Barajas of murder, attempted murder, and kidnapping, and Barajas was sentenced to determinate and indeterminate terms totaling 47 years to life in prison.

Barajas appeals his convictions.  He argues that (1) his conviction in the first trial for shooting at an occupied vehicle should be vacated due to juror misconduct; (2) rather than declaring a mistrial on the murder count in the first trial, under Penal Code

section 1157[1] the trial court should have entered a conviction for murder in the second degree; (3) his convictions in the second trial for murder and attempted murder should be vacated due to prosecutorial misconduct; and (4) his conviction for kidnapping should be vacated for insufficiency of evidence. Alternatively, Barajas argues that the abstract of judgment for his determinate sentence should be corrected because it miscalculated both his sentence and his presentence credits.

As explained below, we affirm Barajas's convictions. However, we conclude that the abstract of judgment for Barajas's determinate sentence miscalculated his sentence and presentence credits. We therefore modify the abstract of judgment and otherwise affirm the judgment.

## I. BACKGROUND

The facts recounted below are drawn from the evidence presented at trial, viewed in the light most favorable to the verdict. (See *People v. Banks* (2015) 61 Cal.4th 788, 795.)

### A. The Relationship Between Barajas and Orozco

This case arises out of the relationship between two men, Barajas and Gabriel Orozco, and a woman, Vanessa Flores. In 2014, when the events at issue occurred, Flores had an on-again, off-again relationship with Barajas. She also was partying with and dating Orozco, which created "bad blood" between Barajas and Orozco.

### B. Relevant Events

#### 1. *Orozco's Vandalism of Barajas's Car*

In the afternoon of August 1, 2014, after going to a movie, Orozco and some friends decided to purchase alcohol. On the way, Orozco drove his red Honda onto the street where Barajas lived and spotted Barajas. This upset Barajas, who accused Orozco

---

[1] Subsequent undesignated statutory references are to the Penal Code.

2

of disrespecting him by coming down his street. After yelling at Orozco and throwing rocks at Orozco's car, Barajas got into his car and chased Orozco for at least 20 minutes.

After dropping his friends off, Orozco said that he had to "go handle some business." In the early evening, Barajas's car was vandalized. A hatchet was found on the front seat of the car, the rear window on the driver's side was smashed, and there were dents on the exterior of the car that appeared to be caused by hatchet strikes. A witness saw a red car fleeing the scene. Orozco later told his friends that he had gone to confront Barajas, but Barajas had run away. Eventually Orozco was charged with vandalizing Barajas's car and pleaded no contest to the charge.

### 2. The Ride from Denay Gutierrez

Around 7:00 or 8:00 p.m., Flores called her friend Denay Gutierrez, asking Gutierrez to give her and Barajas a quick ride. Hoping to get some gas money, Gutierrez agreed and left her father's house to go pick them up.

Gutierrez first picked up Barajas, whom she had not met before. When she picked up Barajas, he acted "[c]alm" and "normal." Gutierrez then picked up Flores, who sat in the back seat while Barajas sat in the front passenger seat. When Flores got into the car, Barajas became a little upset because Flores was wearing sandals. Barajas and Flores then gave Gutierrez the address of a friend's house where they wanted to be dropped off.

### 3. The Shooting at Orozco's Car and Death of Ariana Zendejas

Around the time that Gutierrez picked up Barajas and Flores, Orozco picked up several friends: Timothy Ayala, Robert Sanchez, and, most importantly, Ariana Zendejas. Ayala sat in the front passenger seat with Zendejas and Sanchez in the back.

As Gutierrez was driving, she and Barajas spotted Orozco's red Honda. Barajas's demeanor immediately changed. He became "pushy" and "loud." He started yelling that Orozco had "fucked up" his car, and he directed Gutierrez where and how fast to drive so that she would follow Orozco's car. In doing so, Barajas spoke loudly and "cuss[ed]" at

3

Gutierrez. This scared Gutierrez, who knew that Barajas had been physically abusive with Flores.

Orozco and his friends found it strange and suspicious that Gutierrez's car was following so closely behind them. Ayala wanted to stop to see why the car was following them. But once they stopped, Orozco said he had a bad feeling and they had to go. Orozco then sped off, making some evasive turns to try to get away.

Barajas yelled orders at Gutierrez, telling her to follow Orozco's car, which she did. Barajas said that he wanted to "fuck [Orozco] up." When Gutierrez slowed down, Barajas told her to speed up, which Gutierrez did.

Then, Barajas pulled the strings on the hood of his sweatshirt tightly around his face. He took a gun out of his sweatshirt pocket, leaned half of his body out of the window, and began shooting at Orozco's car. Gutierrez heard between three and six gunshots. She saw the back window of Orozco's car shatter, and Orozco turned right and drove off.

After hearing the gunshots, Ayala, who was in the front passenger seat of Orozco's car, looked back. He saw blood gushing from Zendejas's neck and mouth. Ayala called 911, and Orozco drove the car to the hospital. Zendejas died a few hours later.

### 4. *Subsequent Events*

After the shots, Gutierrez yelled, "[w]hat the fuck was that?" Barajas told Gutierrez to calm down and directed her to drive down a back road. Rather than putting his gun back in his sweatshirt pocket, Barajas put it on his lap with the barrel of the gun facing Gutierrez. Barajas also told Gutierrez that he had an "extra clip." Although Gutierrez was not sure what a clip was, she found the statement threatening and thought it might mean that he had more bullets.

With the gun still in his lap and pointed at Gutierrez, Barajas directed her to drive down some dark and windy roads. Eventually he told Gutierrez to park the car and wait

4

with Flores by the side of the road.  Gutierrez thought about running away, but expecting only to give Barajas a quick ride she had not worn her shoes and, in any event, she was afraid.  After speaking on his cellphone, Barajas ordered Gutierrez and Flores to follow him to a church parking lot, where a woman arrived and drove them away.  The woman dropped Gutierrez off in her father's neighborhood, Gutierrez ran to his house, and she called the police.

## C. The Proceedings Below

After the shooting, Barajas and Flores fled to Mexico, where Barajas was arrested in 2018.  After Barajas was returned to the United States, the San Benito County district attorney charged Barajas with the murder of Ariana Zendejas (§ 187, subd. (a); count 1) and attempted murders of Orozco as well as Ayala and Sanchez, the two other passengers in Orozco's car on the day of the shooting (§§ 187, 664; counts 2-4).  Barajas was also charged with kidnapping Denay Gutierrez (§ 207; count 5) and shooting at an occupied vehicle (§ 246; count 6).  The district attorney alleged that Barajas used and discharged a firearm in committing the murder, attempted murders, and kidnapping (§ 12022.53, subds. (b) & (c)) and personally used a firearm and caused death in shooting at an occupied vehicle (§ 12022.53, subds. (b), (c), & (d)).)

### 1.  *The First Trial*

Barajas went to trial on October 22, 2021.  The jury began deliberating on November 8, 2021.  The following day the jury informed the trial court that it had reached a verdict on count 6, the shooting charge, but was divided on the murder charge and had either not reached agreement or not considered the remaining charges.  The next day, a juror complained of misconduct by other jurors, and the court admonished the jury to follow various instructions that it apparently had not followed.  Later that day, the jury reached unanimous verdicts finding Barajas guilty of the shooting charge in count 6 but acquitting him of the attempted murder of Ayala and Sanchez in counts 2 and 3.  The jury also found true the three firearm enhancements alleged as to the shooting charge.  The

5

jury was unable to reach unanimous verdicts on the murder of Zendejas (count 1), the attempted murder of Orozco (count 4), and the kidnapping of Gutierrez (count 5), and the trial court declared a mistrial on those counts.

### 2. *The Second Trial*

On January 3, 2022, Barajas was re-tried on the murder, attempted murder (of Orozco), and kidnapping charges. On January 14, 2022, the jury found Barajas guilty of all three charges. It determined that the murder charged in count 1 was of the first degree and that the attempted murder of Orozco charged in count 4 was premeditated. It also found the firearms enhancements attached to the three charges to be true.

### 3. *Sentencing and Appeal*

On April 11, 2022, the trial court sentenced Barajas to a minimum total aggregate sentence of 47 years to life. The court imposed a term of 25 years to life on the first-degree murder charge with a consecutive 10-year enhancement for intentionally discharging a firearm. For the attempted murder conviction, the court imposed a term of seven years to life running consecutive to the sentence for murder but dismissed the enhancements. The trial court imposed a determinate sentence of five years for the kidnapping conviction, also running consecutively, but again dismissed the enhancements. Finally, on the shooting conviction, the court imposed a determinate term of five years for the conviction itself and a consecutive term of 25 years to life for the enhancements, but stayed the sentences for both the conviction and the enhancement. The court awarded 1369 days of presentence credit.

Barajas filed a timely notice of appeal.

## II. DISCUSSION

Barajas argues that his convictions should be vacated on four grounds: (1) the trial court failed to conduct an adequate investigation of juror misconduct in the first trial; (2) after the first trial a conviction for murder in the second-degree should have been entered; (3) in the second trial his counsel rendered ineffective assistance by failing to

6

object to prosecutorial misconduct; and (4) the kidnapping conviction was not supported by sufficient evidence. Alternatively, Barajas argues that the abstract of judgment for his determinate sentence should be corrected to accurately reflect his sentence and presentence credits. We consider each argument in turn.

## A. Juror Misconduct in the First Trial

Barajas argues that his conviction in the first trial for shooting at an occupied vehicle should be vacated because there was juror misconduct that the trial court failed to investigate properly. We disagree. When the trial court learned of possible misconduct, it investigated the misconduct, determined its existence and extent, and gave the jury an admonition remedying the misconduct. In addition, Barajas could not have been prejudiced by the misconduct because it occurred after the jury unanimously decided the shooting charge, Barajas' only conviction in the first trial.

### 1. Background

We begin by describing the jury's misconduct and the trial court's response.

The jury began deliberating in the first trial on November 8, 2021. The next day, the jury informed the trial court that it had reached a verdict on count 6, the shooting charge. However, the jury also informed the trial court that it was evenly divided on count 1 (the murder charge) with respect to the degree—"Six for first, six for second"—it was in disagreement on count 5, and it had not reached counts 2, 3, and 4.

The following day, November 10, 2021, Juror No. 8 informed the court that he was having "some difficulties." In open court with defendant and counsel present, the trial court inquired into these difficulties. Juror No. 8 revealed that the foreperson had told the jury, "Let's go with what the majority says," that everyone except Juror No. 8 had agreed, and that all the votes were changed except for Juror No. 8's vote.

Juror No. 8 also testified that, after it became clear that he had not changed his vote, the foreperson asked, "Is it your way or the highway," and Juror No. 8 received "a grilling from everybody." One juror asked, "Are you not thinking of the victim's

7

family," and another asked, "How can you not think about the victims when you're at home." Still another said that "[t]his isn't a death sentence," the defendant is "not going to be sentenced to life imprisonment," and "[i]sn't him going to jail [and] serving some time better than nothing?"

Juror No. 8 noted that there was a verdict on count 6, but said that he had "stood [his] ground" and not allowed the other jurors to change his mind. He also said that, when he refused to go along with the majority vote plan, the jurors who had changed their votes "flipped back."

Crediting Juror No. 8's testimony, the trial court told him that if the prior attacks were repeated, he should telephone and a court official would take him out of the jury room. The trial court then called the other jurors into the court room and reminded the jury of some instructions previously given "because apparently you're not following them." In particular, the court admonished the jury that it should not decide a question "because a majority of the jurors . . . favor that decision," that "the verdict must be unanimous," that the verdict should be based on the evidence "and not ramifications for possible effect it may have on other people," and that it was "not to discuss or consider the subject of penalty or punishment":

"Both the People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. If you can't do so, so be it. Each of you must decide for yourself, but you do so only after discussing the evidence and the instructions with the other jurors.

"Now, these discussions, no yelling, no accusing anybody of something. Simply have an open-minded discussion. Express your views. Listen to the views of others. Then make your decision. If you think your decision is correct, maintain it. You don't have to go along with the herd. If its 11 to 1, so be it.

8

"Please do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision.

"[¶] . . . [¶]

"Remember, you're not a partisan or advocates in this case. You are the impartial judges of the facts. Now, one of the things that I want to be sure of, in order to reach a verdict on any count, or any lesser offense, you have been instructed on, the verdict must be unanimous. All 12 must agree to it. No majority rule. It is not the way we do it.

"[¶] . . . [¶]

"Now, during your deliberations, I want you to discuss the evidence and not the ramifications or the possible effect it may have on other people.

"[¶] . . . [¶]

"Now, one thing I told you, and I repeat it again, you are not to discuss or consider the subject of penalty or punishment. That is something that must not in any way affect your verdict. If any criminal guilt is found, the subject of penalty or punishment is my concern, not yours. Everybody understands that, I hope."

Later on November 10, the jury rendered a verdict. It unanimously found Barajas guilty on the shooting charge (count 6). The jury also unanimously acquitted Barajas of the attempted murder charges in counts 2 and 3. In addition, while the jury unanimously found Barajas guilty of murder on count 1, it did not reach a unanimous decision whether Barajas was guilty of first- or second-degree murder. Finally, the jury was unable to come to a unanimous decision on the lesser included offense of attempted voluntary manslaughter on counts 2 and 3, or on any part of counts 4 and 5.

### 2. *Relevant Legal Principles*

The legal principles governing jury misconduct of the sort here are well established. Criminal defendants have " 'a constitutional right to a trial by unbiased, impartial jurors.' " (*People v. Weatherton* (2014) 59 Cal.4th 589, 598 (*Weatherton*).)

9

This right includes, among other things, the right to a unanimous verdict. (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1134.) As a consequence, jurors may not cast their votes in deference to the views of the majority of the jury. (*People v. Boyette* (2002) 29 Cal.4th 381, 427.) Jurors are also prohibited from considering punishment during the guilt phase of their deliberations (*People v. Engelman* (2002) 28 Cal.4th 436, 442) and from rendering verdicts in the guilt phase of a criminal trial based on sympathy for a victim or a victim's family (*People v. Fields* (1983) 35 Cal.3d 329, 362). Finally, jurors are required to follow the trial court's instructions, and it is misconduct to not do so. (*People v. Lavender* (2014) 60 Cal.4th 679, 687 (*Lavender*); *People v. Williams* (2001) 25 Cal.4th 441, 448-449, 463.)

" 'When a trial court is aware of *possible* juror misconduct, the court "must 'make whatever inquiry is reasonably necessary' " to resolve the matter.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 274 (*Prieto*).) In doing so, the trial court must strike a balance. On the one hand, it must conduct an inquiry sufficient to determine not only whether any juror who engaged in misconduct should be discharged, but also whether the impartiality of other jurors was affected. (*People v. Fuiava* (2012) 53 Cal.4th 622, 702 (*Fuiava*); *People v. McNeal* (1979) 90 Cal.App.3d 830, 839.) On the other hand, the trial court's inquiry " 'should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 927 (*Alexander*).) The decision whether to conduct an investigation as well as " '[t]he specific procedures to follow investigating an allegation of juror misconduct are generally a matter for the trial court's discretion.' " (*People v Johnsen* (2021) 10 Cal.5th 1116, 1170 (*Johnsen*); *Fuiava*, *supra*, at p. 702.) For example, it is up to the trial court to determine whether to conduct a full hearing or informally question a juror (*Johnsen*, *supra*, at p. 1170; *Prieto, supra,* at p. 273), whether to question a juror in-person or telephonically (*Johnsen*, *supra*, at p. 1170), and whether to question multiple jurors (*People v. Seaton* (2001) 26 Cal.4th 598, 676).

If a trial court finds that a juror has engaged in misconduct, it has authority to discharge the juror. (*Alexander*, *supra*, 49 Cal.4th at p. 926; *People v. Beeler* (1995) 9 Cal.4th 953, 989.) If a juror's misconduct taints the entire jury, the trial court also has authority to declare a mistrial. (*People v. Stewart* (2004) 33 Cal.4th 425, 509-511.) In addition, authority to discharge jurors and declare a mistrial includes authority to take less drastic steps to deter misconduct, such as admonishing the jury. (*Alexander*, *supra*, 49 Cal.4th at p. 926; see also *Prieto*, *supra*, 30 Cal.4th at pp. 272-273 [" 'in the absence of evidence to the contrary, we must presume [the jury] followed the court's admonition' "].)

If a juror engaged in misconduct but was not discharged, a presumption of prejudice arises. (*Lavender, supra,* 60 Cal.4th at p. 687.) However, such a presumption may be rebutted by "an affirmative evidentiary showing that prejudice does not exist." (*Ibid*.) The presumption of prejudice also may be rebutted by "a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct." (*Ibid.*)

We review trial court decisions concerning the investigation and remedying of juror misconduct for abuse of discretion. (*Alexander*, *supra*, 49 Cal.4th at p. 927.) In conducting such review, we accept any factual findings and credibility determinations supported by substantial evidence. (*Weatherton*, *supra*, 59 Cal.4th at p. 598). However, because the issues involve mixed questions of fact and law, we independently review whether any misconduct was prejudicial (*ibid*.) and whether any presumption of prejudice has been rebutted (*Lavender*, *supra*, 60 Cal.4th at p. 687).

### 3.  *The Trial Court's Investigation*

There was serious jury misconduct in the first trial. However, the trial court did not abuse its discretion in investigating and remedying that misconduct. To the contrary, the court conducted an inquiry that determined the existence and extent of the

11

misconduct, and it fashioned a remedy that addressed the misconduct without intruding into the jury deliberations more than necessary.

Specifically, the trial court conducted a hearing in which it examined Juror No. 8 and determined both the existence and extent of the jury's misconduct. It learned that, at the instigation of the foreperson, all the jurors except Juror No. 8 agreed to base their verdicts on a majority vote. The court also learned that several jurors improperly urged Juror No. 8 to consider the victims and their families as well as the punishment that Barajas faced. Moreover, the trial court fashioned a remedy addressing this misconduct: It admonished the jury that (1) their verdicts had to be "unanimous" and could not follow "majority rule," (2) they had to base their verdicts on "the evidence" and disregard the possible impact on other people, and (3) they could not consider "penalty or punishment." This admonition was effective: After receiving it, far from rendering a majority vote, the jury deadlocked on the murder charge and two other counts. We therefore conclude that the trial court reasonably exercised its discretion in investigating and remedying the jury misconduct in the first trial.

This conclusion is supported by the conduct of Barajas's trial counsel. Although counsel was present during the trial court's examination of Juror No. 8, counsel did not request that the trial court ask additional questions, interview other jurors, or conduct any other inquiry. Nor did Barajas's counsel object to the admonition given to the jury or ask for any additional remedy. As the Supreme Court has recognized, defense counsel's acquiescence in the trial court's handling of juror misconduct supports the conclusion that trial court conducted an appropriate inquiry.[2] (*Fuiava*, *supra*, 53 Cal.4th at p. 703 ["[D]efense counsel's acquiescence in the trial court's decision regarding how to handle

---

[2] Defense counsel's failure to request additional inquiry in the trial court did not forfeit its objection on appeal to the scope of the trial court's inquiry because the trial court had an independent duty to investigate juror misconduct. (*Johnsen*, *supra*, 10 Cal.5th at p. 1169; *People v. Cowan* (2010) 50 Cal.4th 401, 506.)

the situation, without . . . a request for a hearing regarding the other jurors' ability to continue on the case, further supports our conclusion that a hearing was not warranted."]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1349 ["Defense counsel's observation concerning the juror, made without a concomitant assertion of juror misconduct or request for a hearing on the subject [citation], further indicates that the juror's conduct had not warranted such a hearing."].)

In his opening brief, Barajas contends that the trial court "failed to conduct any . . . inquiry or investigation." That is demonstrably wrong: As recounted above, the trial conducted a hearing in which it questioned Juror No. 8 concerning possible jury misconduct. In his reply brief, Barajas makes a more limited assertion: He contends that the trial court failed to conduct a "sufficient" inquiry and that, as a result, "the extent of the potential juror misconduct is unknown." However, Barajas does not point to anything suggesting that further inquiry was needed or explain what such an inquiry would have entailed beyond interviewing additional jurors about matters on which the court had already credited the testimony of Juror No. 8. In any event, the trial court had good reason to limit its inquiry: As noted above, the Supreme Court has instructed trial courts that any " 'inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations.' " (*Alexander*, *supra*, 49 Cal.4th at pp. 926-927.) Consequently, we conclude that, once the trial court found Juror No. 8's testimony credible, it did not abuse its discretion by limiting its inquiry to examination of that juror.

### 4. *Prejudice*

Even if the trial court had not conducted a reasonable inquiry into juror misconduct, Barajas's challenge to his conviction on the shooting charge still would fail because that conviction was not affected by any juror misconduct. As noted above, absent discharge of the jurors engaging in misconduct, juror misconduct gives "rise to a presumption of prejudice." (*Lavender*, *supra*, 60 Cal.4th at p. 687.) However, this

13

presumption "may be rebutted by an affirmative evidentiary showing that prejudice does not exist" or by an assessment of the "reasonable probability of actual harm resulting from the misconduct." (*Ibid.*) The Attorney General argues that the presumption is rebutted by the admonition that the trial court gave the jury as well as the evidence that the juror's misconduct did not affect their verdict on the shooting charge. We need only consider the latter argument.

As Barajas acknowledges, the jury's misconduct occurred after it had unanimously decided to find him guilty on the shooting charge. The jury informed the court on November 9, 2021 that, while it was divided on one count and had not reached several counts, it had reached a unanimous verdict on count 6, the shooting count. On November 10, the following day, Juror No. 8 told the court that the foreperson had suggested using a majority vote and that all the jurors in the minority except Juror No. 8 had changed their votes but they "flipped back" after Juror No. 8 refused to go along. Accordingly, when Juror No. 8 told the trial court that a verdict had been reached on count 6, the trial court understood Juror No. 8 to mean that the verdict on count 6 was unanimous and untainted by jury misconduct. We share this understanding, which, even more important, is supported by substantial evidence.

Barajas offers no persuasive reason to reach a different conclusion. He asserts that the extent to which the jury's misconduct affected the verdict is unknown. But Barajas does not cite any evidence that the misconduct occurred before the jury reached its verdict on count 6 or explain how subsequent misconduct could have affected the verdict. Indeed, Barajas fails to explain how the jury's misconduct affected the verdicts rendered after the misconduct was discovered and the trial court admonished the jury.

Barajas also asserts that he was prejudiced because the jury was actually biased against him. However, a juror is "actually biased" only if she is "unable to put aside her impressions or opinions . . . and to render a verdict based solely upon the evidence received at trial." (*People v. Nesler* (1997) 16 Cal.4th 561, 583.) Such bias is not

presumed (*People v. Martinez* (2010) 47 Cal.4th 911, 943 [" ' "The court will not presume bias . . . ." ' "]), and Barajas has offered no evidence that the jurors had fixed impressions and opinions that they could not set aside in light of the evidence presented at trial. In fact, the jury in the first trial unanimously acquitted him on two counts of attempted murder.

We therefore reject Barajas's challenge to the verdict in the first trial finding him guilty of shooting at an occupied motor vehicle.

**B. The Murder Charge**

In addition to challenging his conviction in the first trial on the shooting charge, Barajas contends that the trial court dealt improperly with the verdict in the first trial on the murder charge. After the jury informed the trial court that it was unable to reach a decision on the murder charge, the court declared a mistrial on the charge. Although his trial counsel did not object, Barajas now argues that under section 1157 the trial court should have entered a conviction for murder in the second degree and that the double jeopardy bar prohibited the retrial of the murder charge that resulted in his conviction for murder in the first degree in the second trial. We conclude that the trial court correctly declared a mistrial on the murder charge in the first trial and that the Supreme Court's interpretation of section 1157 prohibits its application here.

The double jeopardy bar does not prohibit retrial of charges on which a jury has deadlocked and mistrial has been declared. The double jeopardy clauses in both the United States Constitution and the California Constitution "provide that a person may not be twice placed 'in jeopardy' for the 'same offense,' " which generally prohibits a second prosecution for the same offense after an acquittal or a conviction. (*People v. Anderson* (2009) 47 Cal.4th 92, 103.) However, this bar does not apply where "manifest necessity required the discharge" of the jury (*id.* at p. 104), and such necessity exists if "the trial court determines further [proceedings] are not reasonably likely to result in a verdict" and declares a mistrial. (*People v. Marshall* (1996) 13 Cal.4th 799, 825.) We review a trial

15

court's determination that further proceedings were not reasonably likely to result in a verdict for abuse of discretion. (See, e.g., *People v. Peoples* (2016) 62 Cal.4th 718, 782.)

We find no abuse of discretion here. On November 9, 2021, the jury informed the trial court that it was evenly divided over the degree of the murder charge, and the next day it informed the trial court that it was deadlocked on that charge. The verdict forms indicated a similar disagreement: On the form for the murder charge the jury circled "[g]uilty," but did not make a finding as to the degree; instead, handwriting on the bottom of the form stated that "[c]ould not come up with unanimous decision for 1st or 2nd degree." After confirming with the foreperson and then each of the jurors that they were unable to reach a decision on the murder charge and other counts on which they had not reached agreement, the trial court declared a mistrial on the murder count, without objection from counsel. In light of this record, the trial court properly concluded that the jury was deadlocked on the murder charge and declared a mistrial.

Barajas argues that the trial court should have found that the jury convicted him of murder in the second degree under section 1157. That section states that, "[w]henever a defendant is convicted of a crime . . . which is distinguished into degrees, the jury . . . must find the degree of the crime . . . of which he is guilty." (§ 1157.) Even more pertinently, section 1157 continues that "[u]pon failure of the jury" to so find, "the degree of the crime . . . of which the defendant is guilty . . . shall be deemed to be of the lesser degree." (§ 1157.) Barajas argues that, because the jury agreed that he had committed murder but could not reach agreement on whether he did so in the first-degree or the second-degree, there was a "failure of the jury" to find the degree of crime of which he was guilty under section 1157, and he should have been deemed to have been convicted of second-degree murder.

While plausible, this interpretation of section 1157 was rejected by our Supreme Court nearly 50 years ago. In *People v. Dixon* (1979) 24 Cal.3d 43 (*Dixon*), much as here, a jury informed the trial court that it had unanimously agreed the defendant

16

committed murder but could not agree on whether the murder was in the first-degree or the second-degree. (*Id*. at p. 48.) The trial court instructed the jury to continue deliberating, and the jury eventually convicted the defendant of murder in the first degree. (*Id*. at pp. 48-49.) In the Supreme Court, the defendant argued that the trial court should have informed the jury that, in the absence of unanimity on the degree, a conviction for second-degree murder would be entered pursuant to section 1157. (*Dixon*, *supra*, at p. 49.) The Supreme Court disagreed. It ruled that, in referring to the "failure of the jury" to find the degree of a crime, section 1157 "used the word 'failure' solely in the sense of omission to perform and not in the alternative sense of inability to achieve success." (*Dixon*, *supra*, at p. 52, fn. omitted.) Accordingly, the Supreme Court concluded, section 1157 "should apply only to situations in which the jury has neglected to fix the degree, and not to situations in which express disagreement among members of the jury on the matter of degree has precluded it from achieving unanimity." (*Dixon*, *supra*, at p. 52, fn. omitted.) As *Dixon* remains good law (see, e.g., 3 Witkin, Cal. Criminal Law (5th ed. 2024) Criminal Judgment, § 65), and this case involves a situation in which there was express disagreement among the jurors rather than neglect, *Dixon* precludes application of section 1157 here.

Because we conclude that section 1157 does not apply to the verdict on the murder charge in the first trial and that the trial court did not abuse its discretion in declaring a mistrial on that charge, we need not consider whether Barajas's failure to object to the trial court's declaration of a mistrial precludes him from challenging retrial of the murder charge (see *People v. Avalos* (1984) 37 Cal.3d 216, 228-229), or whether his trial counsel rendered ineffective assistance in failing to do so.

**C. The Closing Argument in the Second Trial**

Barajas also challenges his murder and his attempted murder convictions in the second trial on the ground that, in closing argument for the second trial, the prosecutor misstated the law governing his heat-of-passion defense. As Barajas acknowledges, he

did not object at trial to the prosecutor's statements and therefore has forfeited any claim of prosecutorial misconduct. (See, e.g., *People v. Brown* (2003) 31 Cal.4th 518, 553.) Accordingly, Barajas argues that his trial counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's statements. We disagree. Barajas's trial counsel had valid tactical reasons for not objecting to the statements: Those statements were not material to the heat-of-passion theory Barajas advanced at trial, and objecting to them might have suggested a lack of confidence in that theory.

### 1. *Relevant Legal Principles*

Under both the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution, criminal defendants are entitled to effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 684–686 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).) To establish ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) this deficient performance was prejudicial. (*Strickland*, *supra*, at pp. 688, 692; *Ledesma*, *supra*, at pp. 216–217.) In addition, to avoid the distorting effects of hindsight, courts apply "a strong presumption that counsel's performance falls within a wide range of reasonable professional assistance" (*Strickland*, *supra*, 466 U.S. at p. 689) and "defer to counsel's reasonable tactical decisions" (*People v. Lucas* (2005) 12 Cal.4th 415, 436 (*Lucas*)). Furthermore, if the record does not show why counsel chose to act or not to act—as is frequently the case on direct appeal—the reviewing court must reject challenges to counsel's conduct unless "there simply could be no satisfactory explanation" for the conduct. (*People v. Mai* (2013) 57 Cal.4th 986, 1009; see also *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267 ["claims of ineffective assistance are often more appropriately litigated in a habeas corpus proceeding"].)

In light of these principles, a trial counsel's failure to object to a statement in a prosecutor's closing argument " 'rarely rises to a level implicating one's constitutional

18

right to effective legal counsel. [Citation.].' " (*People v. Dickey* (2005) 35 Cal.4th 884, 941.) As the Supreme Court has explained, "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. v. Hillhouse* (2002) 27 Cal.4th 469, 502; see also *People v. Kelly* (1992) 1 Cal.4th 495, 540 ["An attorney may choose to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel."]; *People v. Frierson* (1991) 53 Cal.3d 730, 749 ["The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal."].) Indeed, even when evidence is improperly admitted or a prosecutor makes a misstatement during closing argument, counsel reasonably may decide not to object because the evidence or statement was "irrelevant or at least unhelpful to the prosecution" (*People v. Riel* (2000) 22 Cal.4th 1153, 1184) or in order to avoid drawing the jury's attention to a matter (*People v. Huggins* (2006) 38 Cal.4th 175, 206 [rejecting ineffective assistance claim based on failure to object to prosecutor's comments because "counsel could have preferred not to draw the jurors' attention to particular comments by the prosecutor by objecting to them"]).

### 2. *Application*

In the second trial, Barajas chose not to dispute that he shot at Orozco's car, arguing instead that he shot at the car in the heat of passion and therefore was guilty of voluntary manslaughter and attempted voluntary manslaughter, not murder and attempted murder. (See, e.g., *People v. Moye* (2009) 47 Cal.4th 537, 549 [noting that "heat of passion" is a " 'theor[y] of partial exculpation' that reduce[s] murder to manslaughter by negating the element of malice"].) In her closing argument, the prosecutor argued that Barajas's heat-of-passion theory failed because the evidence showed that Barajas had "cooled down" by the time he entered Gutierrez's car and a heat-of-passion theory "cannot be resurrected once the event is over, and you have calmed down." Barajas contends that, in so doing, the prosecutor misstated the law and his trial counsel should have objected because the prosecutor's statements undermined counsel's arguments

19

concerning heat of passion. In fact, the prosecutor's statements were not material to the argument of Barajas's counsel. As a consequence, even if we assume that the prosecutor misstated the law,[3] we conclude that Barajas's trial counsel made a reasonable tactical decision not to object.

Barajas asserted in his opening brief that his trial counsel "effectively conceded that appellant cooled off after first learning about the vandalism" of his car by Orozco, but the passion elicited by this conduct was " 're-invigorated when he spotted Orozco driving' " later that evening. That is only half right. Barajas's trial counsel did argue in closing argument that his passion became "reinvigorated" when he saw Orozco driving. However, counsel did not concede that appellant had cooled off. To the contrary, counsel argued that Barajas had not cooled off and that he was pushed "over the edge" when Orozco refused to pull over and allow Barajas to confront him face-to-face.

---

[3] It is not clear that the prosecutor misstated the law in asserting that, once an individual has cooled down and the heat of passion has faded, that passion cannot be resurrected. This assertion is consistent with the long recognized " 'rule . . . that, if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' [Citation.]" (*People v. Daniels* (1991) 52 Cal.3d 815, 868; see also *People v. Wickersham* (1982) 32 Cal.3d 307, 327 (*Wickersham*) ["The subjective element [of heat of passion] requires that the actor be under the actual influence of a strong passion at the time of the homicide."].)

While Barajas contends that a subsequent event may cause a defendant "to re-experience the same passion that he experienced" before cooling down, neither of the cases he cites in support of this contention supports it. In one case, far from finding that the defendant's passion had been resurrected after he cooled down, the Court of Appeal rejected the argument that sufficient time had lapsed after the killing of the defendant's brother for the defendant to cool down. (*People v. Brooks* (1986) 185 Cal.App.3d 687, 695 ["We know of no two-hour period of limitations for a defendant to cool off."].) In the other case, the Attorney General argued that the defendant was not entitled to an instruction on heat of passion because there was a cooling down period. The Supreme Court disagreed, not because the defendant had re-experienced passion after cooling off, but because there was "ample evidence in the record to support the conclusion that this passion was the result of a long course of provocatory conduct." (*People v. Berry* (1976) 18 Cal.3d 509, 516.)

In closing argument, the prosecutor contended that Barajas's heat-of-passion defense failed because Barajas had cooled off by the time that Gutierrez picked him up. The prosecutor began by noting the general rule that, "[i]f sufficient time has lapsed between the provocation and the fatal blow, . . . heat of passion will not apply." Then, turning to the evidence, the prosecutor observed that "[t]he vandalism to Jose Barajas' car happened well over an hour before the shooting" and argued that by the time of the shooting Barajas "had cooled down." In particular, the prosecutor pointed out that, when Barajas got into Gutierrez's car, he was "cordial" and "gentlemanly" and showed only minor irritation when Flores arrived wearing sandals. Finally, the prosecutor argued that the subsequent sighting of Orozco's car "[could not] resurrect the sudden quarrel and heat of passion" because "once a person has recovered from the sudden quarrel, the theory no longer applies."

Barajas's counsel did not object to the prosecutor's argument. Nor did counsel argue that passion may be resurrected after a person has cooled down. Instead, Barajas's counsel argued that "the cooling-off period really had not lapsed" by the time Barajas got into Gutierrez's car. Barajas, counsel contended, was still "seething," the anger "building inside" him, and he went "over the edge" when Orozco refused to pull over. Counsel's theory was that all the relevant events were part of a single course of conduct that "unfolded in a very short period." Barajas's passion, counsel contended, was "spurred" by Orozco driving by his residence and vandalizing his car, and then "further exacerbated" when Orozco did not pull over, which deprived Barajas of the opportunity to confront Orozco face-to-face. Later, Barajas's counsel similarly argued that Orozco's passion "became aroused" by the vandalism to his car and "became re-invigorated when he saw Mr. Orozco driving." Defense counsel made no suggestion that Barajas had cooled off by the time he got into Gutierrez's car and that Barajas's passion was resurrected from scratch by subsequent events.

21

In light of this theory, Barajas's trial counsel had valid tactical reasons not to object to the statements that a defendant's passion cannot be resurrected after the defendant has cooled down. Because counsel did not concede that Barajas had cooled down, much less try to argue that merely seeing Orozco's car and his refusal to stop would place a calm man into the "strong passion" needed to establish the heat-of-passion defense (see *Wickersham*, *supra*, 32 Cal.3d at p. 327), counsel had little to gain by objecting to the prosecutor's statements. Indeed, counsel might have feared that, by objecting to these statements or obtaining an instruction about resurrecting a heat-of-passion defense after the defendant had cooled down, he might signal to the jury a lack of confidence in his contention that Barajas had not cooled down. In light of this danger, counsel reasonably could have concluded that the potential harm from objecting outweighed any minimal benefit that Barajas might have obtained from a successful objection or pinpoint instruction.[4]

Consequently, in light of the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" (*Strickland*, *supra*, 466 U.S. at p. 689), and the deference given trial counsel's tactical decisions (*Lucas*, *supra*, 12 Cal.4th at p. 436), we conclude that Barajas has failed to show that his trial counsel's conduct fell outside the wide range of reasonable professional assistance. In addition, because Barajas has not shown that his counsel's performance was deficient, we do not need to address whether Barajas was prejudiced.

---

[4] At oral argument, Barajas asserted for the first time that it was unreasonable for trial counsel to argue that he had not cooled down. Because this argument was not raised in Barajas' briefs, and the Attorney General had no chance to respond to it, we decline to consider it. (See *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1554, fn. 9 ["We do not consider arguments that are raised for the first time at oral argument."].)

## D. The Kidnapping Charge

Barajas has one additional challenge to his convictions. He argues that his conviction for kidnapping Denay Gutierrez, the woman who was driving him when saw Orozco's car and shot at it, should be vacated for insufficient evidence. To convict a defendant of kidnapping, a prosecutor must prove, among other things, that "the defendant took, held, or detained another person by using force or by instilling reasonable fear." (*People v. Burney* (2009) 47 Cal.4th 203, 232.) Barajas does not dispute that Gutierrez was compelled to follow his directions—which led Gutierrez to chase after Orozco's car and then drive to a dark, deserted rural area—out of fear Barajas would harm her. Instead, Barajas argues that the prosecutor failed to present substantial evidence that Gutierrez's fear was objectively reasonable. We disagree. At least after Barajas shot at Orozco's car and displayed his gun with the barrel pointed towards her, there was substantial evidence that Gutierrez had an objectively reasonable fear of harm if she did not follow Barajas's directions.

In evaluating sufficiency of the evidence, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.) In so doing, we do not reweigh the evidence or reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) Instead, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence" and determine whether " ' "*any* rational trier of fact could have found the essential elements of the allegations beyond a reasonable doubt." ' " (*Ibid*.)

The record here contains substantial evidence that Gutierrez had an objectively reasonable belief that Barajas would harm her if she did not follow his directions. After Barajas saw Orozco's car, he did not politely ask Gutierrez to follow Orozco. Instead, he

23

became angry and began yelling loudly and cursing at Gutierrez, ordering her where and how fast to go. Eventually, Barajas pulled the strings on his hoodie to cover his face, leaned halfway out the car, and fired as many as six shots at Orozco's car, one of which Gutierrez saw shatter the back window.

After Orozco fled, Barajas continued to order Gutierrez around. He told her to drive past a high school and onto a country road without any housing developments or streetlights. Moreover, Barajas did not put his gun back in his sweatshirt pocket, where his gun was concealed when he came into the car. Instead, he placed the gun on his lap with his hand on the trigger, most of the time with the barrel pointed at Gutierrez. Barajas also told Gutierrez that he had an extra clip, thereby dispelling any notion that he might have fired all of his bullets. Moreover, Gutierrez knew that Barajas had no qualms about hurting a woman because his girlfriend Flores had told Gutierrez that Barajas was physically abusive. Under these circumstances, a rational trier of fact could find that Gutierrez had an objectively reasonable fear that the man who had just fired multiple shots at Orozcos's car would shoot her if she did not follow his instructions.

As Barajas does not dispute that substantial evidence supports the other requirements for kidnapping, we conclude that the kidnapping conviction is supported by substantial evidence.

### E. Calculation of Presentence Credits

In addition to challenging his convictions, Barajas argues in the alternative that the abstract of judgment for his determinate sentence should be modified because the trial court miscalculated his presentence credits. The Attorney General concedes this error, and we accept this concession. "[A] sentencing court must award credit for all days in custody up to and including the day of sentencing." (*People v. Bravo* (1990) 219 Cal.App.3d 729, 735.) This includes partial days. (*Ibid*.) Barajas was arrested on July 12, 2018, and sentenced on April 11, 2022. Counting both the day of his arrest and the day of his sentencing, and all days in between, he was entitled to 1,370 days of

24

presentence custody credits. Therefore, the trial court erred in awarding only 1,369 days of custody credits, and we will modify the abstract of judgment to award 1,370 days of presentence custody credits.

### F. Correction of the Determinate Abstract of Judgment

Finally, Barajas argues that the abstract of judgment for his determinate sentence should be modified because it incorrectly lists the total determinate term as 10 years rather than five years. The Attorney General agrees that the determinate abstract of judgment should be corrected, but he contends that we should modify the abstract to reflect a total determinate sentence of 15 years. We agree with Barajas that the determinate abstract should be modified to reflect a total determinate term of five years.

When there is a discrepancy between the oral pronouncement of judgment and the minute order or abstract of judgment, the oral pronouncement controls. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Courts may correct clerical orders at any time, and appellate courts that have properly assumed jurisdiction of a case may order correction of an abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

The determinate abstract of judgment correctly reflects that Barajas received a five-year determinate term for count 5, but it incorrectly lists the "total time" in the determinate abstract as 10 years. We will correct the determinate abstract of judgment to reflect a total time of five years.

The Attorney General suggests that we instead modify the determinate abstract of judgment to reflect a total time of 15 years, consisting of 10 years for the determinate enhancement term attached to count 1, together with the five-year determinate term imposed for count 4. We decline to follow this approach. The court sentenced Barajas to an indeterminate term of 25 years to life on count 1, the murder charge. Attached to the indeterminate term for count 1 was a 10-year determinate term for a firearm enhancement (§ 12022.53, subd. (b)). The 10-year determinate term for the enhancement is accurately and correctly reflected in the indeterminate abstract of judgment. (See *People v. Felix*

25

(2000) 22 Cal.4th 651, 655-656 ["Even though enhancements such as that for section 12022.5 are themselves determinate, i.e., for a specified number of years, they may be attached to an indeterminate as well as determinate terms."].) Consequently, that enhancement term should not be added to the "total time" in the determinate abstract of justice.

### III. DISPOSITION

The abstract of judgment for Barajas's determinate sentence is modified to reflect, in box 8, that the "total time" is five years, and the "credit for time served" in box 16 is modified to 1370 total credits and 1370 actual credits. The trial court is directed to amend the determinate abstract of judgment accordingly and forward a certified copy of the amended abstract to the Department of Corrections. As modified, the judgment of conviction is affirmed.

_____
BROMBERG, J.

WE CONCUR:


_____
GROVER, ACTING P. J.




_____
LIE, J.




*People v. Barajas*
H049954